UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SHARON DURANT

      Plaintiff
      Vs.
      Defendants:

(1) A.C.S STATE & LOCAL SOLUTIONS, Inc
  A.K.A. E-Z PASS.

(2) TERRI SIMEON, SUPERVISOR

(3) DISTINCTIVE TEMPORARIES
  A.K.A EMPLOYEE LEASING OF
  GREATER NEW YORK LLC.

(4) SUPERIOR STAFFING INC
-----------------------------------------------------------X

Docket No............

Complaint
Jury Trial Demanded

**05 CIV. 7303**

**Judge McMahon**

**ECF CASE**

  Plaintiff SHARON DURANT, by her attorney, Dennis Adjei-Brenyah Esq.

alleges and complains against the Defendants as follows:

<u>1 NATURE OF CLAIM.</u>

1. a) This action is brought to secure protection and seek redress, including damages

to the Plaintiff under the Civil Rights Act (1964) as amended in that Defendants

discriminated against Plaintiff by engaging in sexual harassment of the Plaintiff and when

Plaintiff resisted such sexual harassment she was constructively discharged from her

employment with the first named Defendant.

  b) FURTHERMORE, this action is also predicted upon NY State Executive Law

Section 296 (Human Rights Law). In that Defendants unlawfully sexually harassed

Plaintiff and when she protested she was constructively discharged from her employment.

c) This action is also founded upon New York State Common Law in that the conduct alleged in this complaint constitutes intentional infliction of emotional distress and it did cause emotional distress and pain to Plaintiff.

## 11 JURISDICTION.

2.  Jurisdiction of the court is invoked because federal questions are indicated and the Civil Rights Acts of 1964 and 1991 are in issue. FURTHERMORE, this court has pendant jurisdiction in respect of the claims arising under New York State Law.

## 111 VENUE.

3.  Venue is proper in that the conduct challenged in this action occurred n this judicial district.

## 1V PLAINTIFF.

4.  Plaintiff SHARON DURANT was recruited by third named Defendant Distinctive Temporaries (Distinctive Personnel) as a Sales Representative for A.C.S STATE and LOCAL SOLUTIONS for training and service as a Sales Representative. Plaintiff alleges that she was sexually harassed by the second named Defendant TERRI SIMEON and when she requested and complained about this same sex harassment, she was forced to quit her employment with A.C.S STATE and LOCAL SOLUTIONS.

## V DEFENDANTS.

5.  a) Upon information and belief, DISTINCTIVE PERSONNEL(TEMPORARIES) also known as EMPLOYEE LEASING OF GREATER NEW YORK, LLC is an employment agency in the business of procuring personnel and placing them with various office as needed . DISTINCTIVE PERSONNEL recruited Plaintiff and placed her to work for and under the control of A.C.S STATE AND LOCAL SOLUTIONS INC.

2

Distinctive Personnel operates from its offices at; 60 East 42nd Street, Suite 146, New York, NY 10165.

b) Upon information and belief, A.C.S STATE AND LOCAL SOLUTIONS INC is in a conjoined business effort with DISTINCTIVE PERSONNEL and it receives trains and places personnel for the specific task at hand. The office where the alleged conduct took place is E-Z Pass, Spring Valley Branch, 17 Pearlman Drive, Spring Valley, New York. 10977.

c) Upon information and belief, SUPERIOR STAFFING is an arm or division of EMPLOYEE LEASING OF GREATER NEW YORK LLC (the first named Respondent) and is the entity that exerted controls and discipline if any on employees. Furthermore, upon information and belief, SUPERIOR STAFFING, otherwise known as SUPERIOR TECHNICAL RESOURCES, INC paid (or pays) the salaries and wages of employees of Distinctive Personnel including the charging party,

d) TERRI SIMEON is the supervisor and trainer provided by A.C.S STATE AND LOCAL SOLUTIONS otherwise known as E-Z Pass who provided training to new recruits /employees hired by SUPERIOR STAFFING and DISTINCTIVE PERSONNEL and is name here as the perpetrator of the conduct challenged in this complaint. SHARON DURANT was assigned to TERRI SIMEON for training and supervision and evaluation of performance.

## VI. STATEMENT OF CLAIM.

6.   Plaintiff was initially recruited by Distinctive Personnel or on about March 5, 2005, and placed with A.C.S STATE AND LOCAL SOLUTIONS INC for training and engagement as sales representative.

7.   a) From the very inception of the training period, Ms SIMEON initiated conduct directed to the Plaintiff that showed interest in her, but she initially believed that it was probably TERRI SIMEON'S training method.

b) In the course of the training, TERRI SIMEON made explicit references to some good sex she had with her plumber boyfriend and made regular references to sex related themes.

c) Soon, it became clear to Ms. DURANT that Ms. SIMEON'S conduct towards her was "uncomfortable". This conduct included leering at Ms. DURANT, especially at her breast constantly.

8   On or about the second week of training, Ms SIMEON invited SHARON DURANT to come to her desk but the she would not say anything related to training.

9   On one occasion, (within the second week of training) Ms SIMEON called Ms. DURANT to her desk and told her that she had something to tell her. She said it was important. It sounded important. So, Ms Durant told Ms SIMEON to let her know what this was about. Ms.DURANT naturally thought it was in connection with her training and some tasks she needed to do.

10   TERRI SIMEON stated to Ms. DURANT that she would tell her later. Later that day, TERRI SIMEON walked over to where complainant was sitting, placed her arm over the cube, looked over at Ms DURANT'S breast area and asked her what time she was going to leave for the day. Ms DURANT replied that she was schedule to leave work at about 7:15 p.m. that day. Ms SIMEON then said, "OK I'll tell you later." Ms DURANT asked her again to let her know what is was so important. Ms. SIMEON stated that she would let her know "before you leave".

11. Ms. SIMEON then moved her desk to sit next to Ms. DURANT and handed her a note which to the best of her recollection, stated clearly, " It's pertaining to my question " (the writhing was in green ink pen). Unable to understand what that meant, Ms. DURANT wrote back on note; "What? What question?" This was in black ink.

12. In response to Ms. SHARON, s perplexed question, Ms, SIMEON wrote back on the note: "How about you and me?"or "you, me and my friend" she wrote, "I don't want you to reject me or my weight ". Upon receiving this note, Ms. DURANT became stunned, confused, and sick and cried. She kept the note. Ms. DURANT told TERRI SIMEON never to request such nonsense from her. At that time DURANT decided not to say any thing to the supervisors because she was afraid to lose her new job. However, she told her two colleagues, Yanel and Rashad.

13. In or about April 2, 2003 Ms SHARON DURANT received another note from TERRI SIMEON in which she was even more brazen in her demand for sexual favors.

"Is it true that Evans was playing with your kitty when he was training you?
I heard this and they said it is why Lena does not like you"
How do you feel about me touching you on the down like- when I am helping you with a customer?
I don't know why but you fascinate me, write back on the back so I can throw away"

14   Ms SHARON DURANT showed the note written by the Supervisor to a colleague trainee one Ms Yanel. DURANT became frightened, confused, and cried.

15. On or about April 4, 2003, Ms DURANT learned that Ms. SIMEON had found out that Ms. Durant's private cell phone number from another trainee Ms. Cindy Senat and she (Simeon) had found out that Ms. DURANT, Cindy Senat, and Ms. SIMEON lived in the same development complex.

16. At about the same time, Ms SIMEON called SHARON DURANT on her private cell phone and left a message, which stated as follows: "Hey ma it's TERRI, I didn't see you when you came in, is everything alright? I heard you were crying. Call and ask for TERRI, alright, ext 32. When you call just ask to speak to me." The message adverted to was left at about 11:23 a.m.

17. Upon the receipt of the second note wherein, TERRI SIMEON stated (among other things) that she wanted to Plaintiff "touch me down low" when she was assisting Plaintiff with another customer, DURANT became extremely depressed, sad and frightened and showed the note to Yanel, a co-worker.

18. Furthermore, DURANT reported the matter to other Senior Personnel including Amere.

19. On the same day that Plaintiff received the second note, she had requested a ride home from a co-worker. He agreed to give her a ride. When TERRI SIMEON heard that Plaintiff was going to have a ride home in that person's car, she also went to him to have a ride to "Stop and Shop." When Plaintiff saw this, she declined the offer for a ride home.

20. Meanwhile, another supervisor called Lena, stopped by Plaintiff's desk for something. This was the "Lena" who, it was stated (in the note) did not like Plaintiff because "Evans was playing with your kitty when he was training you." Plaintiff asked if she knew anything about that and showed her the note. She denied ever saying to anybody anything about the statements in the note. At that time upon information and belief, Lena thought a man had written that note to Plaintiff. Lena called Evans denied having done anything to Plaintiff while he was training Plaintiff. Lena asked Plaintiff

6

who had written that note to me and Plaintiff said "TERRI." She appeared to be shocked but did not do anything at that time.

21. Later, following my complaint to the senior supervisor, Plaintiff was told to move to the front desk while Plaintiff was at the front desk TERRI SIMEON again came over to "talk" to her. When Amere another supervisor saw that he said to SIMEON "Leave her alone!"

22. Sometime later, one Tami (from Distinctive) called and informed Plaintiff that the company was investigating her complaint of sexual harassment. Plaintiff was told that everything would be done to ensure that I was not harassed.

23. Upon information and belief, Tami called corporate offices at Staten Island and someone came from Superior Staffing and Plaintiff was assured that the company would make it comfortable to work at E-Z Pass. One Ms. Lorraine Stephens specifically spoke to Plaintiff and told her that she had nothing to worry about or fear "everything would be alright."

24. The following day the company had asked TERRI SIMEON to take a couple of days off with pay. Plaintiff was also asked to take a couple of days off.
When Plaintiff returned to work, TERRI SIMEON was back in the office and Tami again came to me to say that it was not the fault of Distinctive Personnel, that A.C.S shocked a lot of people with the way they handled the matter. This was in April 16, 2003. Plaintiff tried to resign because she felt misled by the companies after they assured her that she would not have to work with or under TERRI SIMEON.

25. Another supervisor called Kim from ACS (E-Z Pass) assured me the company would not allow harassment of this nature. Later that day, as Plaintiff was crying over

7

the mistreatment she had received from management. Jean Claude apparently from Distinctive Personnel called me to say that they were all shocked that ACS would bring back TERRI SIMEON after knowing the situation.

26. Plaintiff became frightened, ashamed, humiliated and felt depressed that the companies gave her assurances but did not do anything to alleviate her situation while TERRI SIMEON was brought back to work after only a couple of days of leave. Plaintiff became the subject of discussion and shame and humiliation at the workplace.

27. Upon information and belief, TERRI SIMEON was fully paid while she was on leave for harassing Plaintiff.

28. Incidentally, in or about early April, after Plaintiff had complained to management about the sexual harassment she was being subjected to, Lorraine Stephens the Program Manager at Superior Staffing Services, Inc sent a memo addressed to "All temporary employees currently assigned at ACS State and Local Solutions." That memo was titled "*Sexual Harassment.*"

29. Furthermore, Lorraine Stephens personally and directly assured Plaintiff that the companies will protect her from sexual harassment but constructively discharged Plaintiff and brought back TERRI SIMEON.

30. On or about April 30, 2003, Ms. Durant retained counsel who wrote a letter addressed to Ms. Lorraine Stephens and copied to all the managers who had forced the termination of Durant from her employment because she resisted sexual harassment by one of their female supervisors. None of the parties responded to the letter except the corporate offices of Lorraine Stephens.

31. In response to the counsel's letter dated April 30, 2003 and addressed to Lorraine Stephens (who had personally taken part and directed some of the investigation and decision making, Superior Staffing denied any responsibility in this affair.

32. In or about November 2003, Plaintiff filed complaint with the Equal Opportunity Commission in New York.

33. In or about May 2005, Plaintifff requested and received Notice and Right to Sue a copy is attached to this complaint. Accordingly Plaintiff charges the following independent and separate cause of action.

### Vl1 AS AND FOR A FIRST CAUSE OF ACTION.

34. Through their conduct adverted to in the preceding paragraphs, in particular, defendant ACS STATE SOLUTIONS INC per its supervising agents conduct expressly demanding sexual favors from an employee including: The very graphic asking whether it was true that; "Evans was playing with your kitty when he was training you?" and the specific request for sexual gratification in the statement that; "How do you feel about me touching you on the down low like - when I am helping you with a customer?" amount to grotesque and brazen forms of sexual harassment in violation of Title Vl1 of the Civil Rights Act 1964 as amended.

### Vlll AS AND FOR A SECOND CAUSE OF ACTION.

35. The conduct adverted to in the immediately preceding paragraph also constituted violation of New York State Executive Law Section 296(6) being a sexual harassment and sex discrimination.

### lX AS AND FOR A THIRD CAUSE OF ACTION.

36. The conduct of defendant E-Z Pass in THE fostering the perpetrator in the environment of the workplace whereof, the harasser was still in a position of authority over the this Plaintiff and the conduct of harasser continued to insinuate and expressly demand sexual favors constituted hostile work environment so severe as to constitute sexual harassment in itself.

### X AS AND FOR A FOURTH CAUSE OF ACTION.

37. The conduct alleged in the preceding paragraphs also constituted hostile work environment under NY State Executive Law.

### XI AS AND FOR A FIFTH CAUSEOF ACTION.

38. The conduct of Defendants as alleged in the preceding paragraphs, in particular the explicit demands for sexual gratification by a supervisor in the conduct of her supervision over Plaintiff constituted intentional infliction of emotional stress under NY State Common Law.

### X11 AS AND FOR A SIXTH CAUSE OF ACTION.

39. The conduct of Defendant E-Z Pass whereby it permitted the harasser /perpetrator of the harassing events to continue to conduct her brazen sexual demands on Plaintiff and the failure to train or offer control her conduct and further created conditions under which Plaintiff operated in fear and humiliation created a condition under which Plaintiff was constructively discharged from her employment.

### X111 AS AND FOR A SEVENTH CAUSE FOR ACTION

40. The conduct of Defendants as alleged in the preceding paragraphs especially the failure to protect the interest of the Plaintiff created such hostile work environment for her as to constructively terminate her employment under NY Staff Law.

10

## PRAYER FOR RELIEF.

WHEREFORE, Plaintiff respectively prays for judgment as follows:

A    Award Plaintiff judgment relating to the unlawful sexual harassment under

i) The Civil Rights Act 1964 as amended

ii) The New York Staff Executive Law Human Rights Law.

B    i) Damages in the amount of $250,000 (Two hundred and fifty thousand dollars) under the Civil Rights Law as amended compensatory.

ii) Damages in the amount of $2,000,000 (Two million dollars) under New York State Executive Law Compensatory.

C    Damages under NY State Common Law as determined by the Jury as constituted.

D    Demand for Punitive Damages as warranted and as determined by the court/Jury to reflect the malicious and wanton disregard of rights secured to the Plaintiff under both state and federal law.

E    Award plaintiff reasonable attorney fees.

F    Grant Plaintiff such other and further relief as this court may deem just and proper together with costs and disbursement.

DATE:
This 1st day of August 2005
Spring Valley

Dennis Adjei Brenyah
12 Rensselaer Drive
Spring Valley, NY 10977-1827
(845) 356 7034

11