THE KULLMAN FIRM
Samuel Zurik III (LA #24716)
Stephen L. Scott (LA #25869)
*Attorneys for Defendant ACS State and*
*Local Solutions, Inc.*
1600 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Phone ( 504) 524-4162

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Michael R. Gordon (MG-7838)
Daniel J. Doron (DD-6062)
*Attorneys for Defendant ACS State and*
*Local Solutions, Inc.*
599 Lexington Avenue
New York, New York 10022-6030
Phone: (212) 536-3900

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SHARON DURANT

        Plaintiff            05 CIV. 7303  (CM)

vs.

           ECF Case

(1)  A.C.S. STATE & LOCAL SOLUTIONS,
INC. a/k/a E-Z PASS

(2) TERRI SIMEON, SUPERVISOR

(3) DISTINCTIVE TEMPORARIES a/k/a
EMPLOYEE LEASING OF GREATER NEW
YORK LLC

(4)  SUPERIOR STAFFING INC.

        Defendants

**DEFENDANT ACS STATE AND LOCAL SOLUTIONS, INC.'S**
**STATEMENT OF UNCONTESTED MATERIAL FACTS**

Defendant ACS State and Local Solutions, Inc. ("ACS" or "Company") through undersigned counsel submits the following statement of uncontested material facts that Defendant maintains there does not exist a genuine issue to be tried:

1. ACS State and Local Solutions, Inc. has a contractual arrangement with the New York State Throughway for the operation of an EZ Pass customer service call center in Spring Valley, New York. (Declaration of Anna Frattalone, attached as Exhibit 1 to Defendant's Motion for Summary Judgment.)

2. For the operation of the EZ Pass location in Spring Valley, New York, ACS contracts with employment agencies who provide temporary workers to ACS in positions such as Customer Service Representative ("CSR"). (Ex. 1.)

3. Plaintiff, Sharon Durant, was hired by one of these employment agencies, Distinctive (former Defendant), to work at the Spring Valley EZ Pass location, but was paid by another temporary agency, Superior (former Defendant). (Deposition of Sharon Durant at 13, 39; Ex. 2.) According to Plaintiff, Distinctive directed her work, but ACS could discipline her. (Ex. 2 at 39-40.)

4. Plaintiff admitted that she had no knowledge of the relationship between Distinctive, ACS, and Superior, never saw an employee disciplined, was never threatened with discipline, and had not been educated on how employees were to be disciplined. (Ex. 2 at 41-42.)

5. The only basis on which Plaintiff relies to suggest that ACS could discipline her is the contention that her supervisors were ACS employees. (Ex. 2 at 40.)

6. Plaintiff was hired by Distinctive on March 5, 2003 by "Tami." Plaintiff's last day employed by Distinctive and assigned to the EZ Pass location was April 16, 2003. (Ex. 2 at 20, 41, 47.)

7. Plaintiff was trained and assigned as a customer service representative ("CSR"). (Ex. 2 at 37, 47.)

8. The duties of a CSR involved taking phone calls from EZ Pass customers, making sure that the CSR understood customer needs, informing customers of their balance, and finding out how many vehicles a customer had. (Ex. 2 at 48.)

9. Plaintiff does not know the duties of Senior CSRs or the duties of Work Leaders. (Ex. 2 at 48-49.)

10. Plaintiff contends that the alleged harasser in this case, Terri Simeon, was her "supervisor," and that she supervised the entire floor and staff, and that her position was above that of a Work Leader. (Ex. 2 at 32-34.)

11. In support of her contention that Simeon was an ACS supervisor, Plaintiff claims that she was a supervisor because she trained the new people coming in and that her Company title was "supervisor," although Plaintiff admitted to having no proof to back up the assertion. (Ex. 2 at 32-33, 123.)

12. When asked if Simeon could discipline her, Plaintiff testified that she did not know. (Ex. 2 at 35.) Based on Simeon telling trainees in a training class that if they did not score a certain percentage on tests they could be fired, Plaintiff believed that Simeon could terminate her employment. (Ex. 2 at 35-36.)

13. According to Plaintiff, in addition to Simeon being a supervisor, Lima, Kim, and Amer were supervisors, and she would report first to Amer with a problem before going to the supervisors on the floor. (Ex. 2 at 38-39.)

14. Plaintiff testified that Simeon never disciplined her or demoted her. Moreover, Simeon never threatened to discipline or demote her. Plaintiff claims that the only assignment given to her by Simeon was the assignment of a cubicle to work in during a shift. (Ex. 2 at 51.) Simeon did not give work assignments. (Ex. 2 at 52.)

15. Simeon was in fact not a supervisor. (Declaration of Terri Simeon, attached as Exhibit 3.) During the short duration of Plaintiff's assignment to the Spring Valley EZ Pass location, Terri Simeon was a Customer Service Representative, although she was employed by ACS rather than Distinctive or Superior. (Ex. 3.) Simeon was considered an "acting" Senior Customer Service Representative or "acting" Work Leader in this time period. (Ex. 3.)

16. In this capacity, Simeon assisted CSRs with escalated calls, which occur most frequently when a customer is not satisfied with the information provided to her by the CSR on the telephone. (Ex. 3.) In 2003, during Plaintiff's assignment to the location, handling escalated calls was the only duty Simeon had in addition to regular CSR duties and responsibilities. (Ex. 3.)

17. Simeon did not track attendance, monitor CSRs, prepare or participate in evaluations, or make recommendations regarding disciplinary actions, hires, or terminations of individuals. (Ex. 3.)

18. In March 2003, Simeon also served as a substitute trainer. (Ex. 3.) In this time period, there were between 13 and 14 individuals in the training class, including Plaintiff. There were two trainers including Simeon. The EZ Pass Project training involved the discussion of EZ Pass plans that are offered to customers, phone etiquette, opening and closing scripts, information regarding contact numbers at the Port Authority, the location of service centers, and software information. (Ex. 3.)

19.     In the training class, Simeon distributed and administered two tests and several quizzes involving the materials gone over with trainees during the two week training period. Simeon would grade the tests against an answer key, but would not analyze the results. Results were forwarded to the Staten Island office for review and evaluation. As a substitute trainer, Simeon served as a liaison between trainees and supervisors. Any questions from trainees would be forwarded to supervisors. (Ex. 3.)

20.     In 2003, Defendant, ACS, maintained a sexual harassment policy in the Spring Valley location developed by its predecessor, Lockheed Martin. (Ex. 1, Attachment A.)

21.     Plaintiff alleges that she was unaware of any policy promulgated by her employer, Distinctive. (Ex. 2 at 43.) Plaintiff alleges that she looked for a harassment policy in the Spring Valley break room but did not find one. (Ex. 2 at 45.) However, from previous jobs, Plaintiff knew that if she had a harassment complaint, she should bring it to the attention of Human Resources. (Ex. 2 at 44-45.)

22.     During the two week training period, Plaintiff heard employees making off-color jokes, but none of the jokes offended Plaintiff. (Ex. 2 at 54.)

23.     Plaintiff claims to have overheard Simeon make a comment about having sex with her plumber boyfriend. (Ex. 2 at 55-57.) The comment was not made to Plaintiff; Plaintiff overheard it while reading for a test. (Ex. 2 at 57.) Plaintiff testified that the comment was just that Simeon had had sex with her boyfriend. Simeon did not describe the sex. (Ex. 2 at 58.)

24.     Plaintiff believes that the highest positioned ACS employee was Amenola Amer. (Ex. 2 at 34-35.)

25. According to Plaintiff, Simeon's harassment of her consisted of two notes. Simeon provided Plaintiff with the first note during the second week of training, which would have been in early March. The second note was given to Simeon on April 3, 2003. (Ex. 2 at 68-69.)

26. Plaintiff testified that other than the two notes, there was no other harassing conduct or comments. (Ex. 2 at 69-70.)

27. The first note, according to Plaintiff, was to the effect of "[H]ow about you and me or me you and my friend, I don't want to be rejected [sic] or my weight." (Ex. 2 at 70.)

28. After receiving the note, Plaintiff continued to work. Plaintiff claims that she was mad and upset because she did not know where Simeon was going with it. (Ex. 2 at 73.) Plaintiff told Simeon "don't send me no nonsense," when they were leaving for the evening. (Ex. 2 at 73-74.)

29. Although Plaintiff claims to have been offended by the first note (Ex. 2 at 92.), and although she told a co-worker about the note, Plaintiff did not report receiving the note to anyone in management or to a supervisor. (Ex. 2 at 75.)

30. The only other harassing conduct alleged by Plaintiff was a second note from Simeon given to her between April 3 and April 5. (Ex. 2 at 76-77.)

31. The note alluded to Plaintiff having her "kitty played with" by a male employee and asked her "[h]ow do you feel about me touching you on the down low like-when I am helping you w/a customer? I don't know why but you fascinate me." (Ex. 2 at 78; Exhibit 1 to Plaintiff's Depo.) According to Plaintiff, she felt humiliated and ashamed by the second note, but took it upon herself to discuss the note with co-workers. (Ex. 2 at 92-93.)

32. Although Plaintiff received the note at 3:00 p.m. the day before and worked until 5:00 p.m. on that day, and although Plaintiff told co-workers about the note, Plaintiff did not inform a

supervisor or manager until a day later at around 10:15 in the morning. At that time, Plaintiff showed the note to "Lima" (Lema Anderson-Gauthier). Lema immediately took the note from Plaintiff and delivered it to Amenola Amer. (Ex. 2 at 80.)

33.     Work Leaders "Kim" and Lema, as well as the supervisor, Amer, moved Plaintiff to a different work station in the front by Amer's office within 40 minutes of Plaintiff reporting the note to Lema. (Ex. 2 at 80-81, 85-86.) Plaintiff's assigned position remained the same, she was not demoted and had no change in her pay through her employer, Distinctive. (Ex. 2 at 101.)

34.     Amer spoke to Plaintiff and assured her that ACS was going to look into the situation and would keep Terri Simeon away from her. It was made clear to Plaintiff that ACS (through Amer) and Distinctive (through "Tami") were going to investigate the situation. (Ex. 2 at 82-83.)

35.     In fact, Tony Brown, a management level employee of ACS, spoke with Plaintiff and representatives of both Superior and Distinctive spoke to Plaintiff about her complaint. (Ex. 2 at 96-97.) Plaintiff has no recollection of what she told Tony Brown about the situation and does not know whether ACS looked into her complaint. (Ex. 2 at 97.) Moreover, Plaintiff "does not remember" whether she was satisfied with the way her meeting with Tony Brown went. (Ex. 2 at 98.)

36.     Plaintiff worked the remainder of the day and had no contact with Simeon. (Ex. 2 at 84-85.) The following day, Simeon left Plaintiff a phone message that stated, "Say hi, ma, it's me Terri. I heard you was crying. What's wrong. Call me at extension 32 and just ask me, Terri." (Ex. 2 at 86.)

37.     Plaintiff did not tell anyone about the phone message. (Ex. 2 at 86-87.) On that morning, after the message, Simeon approached Plaintiff but did not get a chance to say anything to Plaintiff because Amer instructed Simeon to move. (Ex. 2 at 87.) Simeon moved right away, did

7

not speak to Plaintiff, and did not touch her. (Id.) According to Plaintiff, Simeon did not bother her again after Amer told her to move away from Plaintiff. (Ex. 2 at 90.)

38. Plaintiff was allowed to take three days off from her temporary assignment, which she appreciated. Plaintiff does not know whether Distinctive paid her or not. (Ex. 2 at 101-02.)

39. At the time Simeon left Plaintiff the phone message and later approached Plaintiff at her new work area, Simeon did not know that Plaintiff had complained to Amer. (Ex. 3.) When instructed by Amer to move away from Plaintiff, Simeon complied immediately. (Ex. 3.)

40. On this same morning, Simeon was called into a meeting with Tony Brown, and an ACS HR representative who questioned her regarding the note that she had given to Plaintiff. Although Simeon explained that the conduct was welcomed[1] on the part of Plaintiff, she admitted that she had written the note. As a result, Simeon was suspended for five days and was escorted out of the building. (Ex. 3.) Ultimately, Simeon was placed on a final warning for her behavior and a promotion was delayed based on the disciplinary action meted out by ACS. (Ex. 3; Attachment 1.)

41. Plaintiff did not see Simeon again until the day that Plaintiff resigned on April 16, 2003. (Ex. 2 at 89.) According to Simeon, she never approached Durant again to speak with her out of fear of being terminated. (Ex. 3.) Moreover, Simeon did not speak with anyone about the complaint that had been made against her. (Ex. 3.)

42. Plaintiff agrees. Simeon never gave her any more notes, never made sexual advances again, and otherwise, never harassed her again. (Ex. 2 at 99.)

---

[1] For purposed of Defendant's Motion for Summary Judgment, Defendant will not present the facts and evidence that it would ultimately present at trial on the issue of whether Plaintiff welcomed the alleged conduct that Simeon is accused of in this lawsuit. Such evidence would include not only the testimony of Terri Simeon but also significant testimony from co-workers and other temporary workers bearing on the actions of Plaintiff that would demonstrate clearly that Plaintiff engaged in and initiated the type of conduct that she now complains of in this case.

43. On the last day of Plaintiff's employment on April 16, 2003, Plaintiff claims that she was forced to resign. (Ex. 2 at 58-59.) She claims that she was forced to resign because "no one ever came to me to talk to me."(Ex. 2 at 59.)

44. Plaintiff claims that on April 16, Simeon passed back and forth going to and from the kitchen behind Plaintiff's cubicle and at one point stopped at the cubicle adjacent to Plaintiff and said "hey" to the person, and "acted like she was talking to the next person to the side of me." (Ex. 2 at 59, 61-63.) Most of her body was toward Plaintiff. (Id.) Plaintiff claims that Simeon was staring at her, but in reality did not know because Plaintiff had her back to Simeon. (Ex. 2 at 64.) Plaintiff claimed that she could "feel" Simeon staring at her. (Ex. 2 at 64-65.)

45. Plaintiff told an ACS Work Leader, Kim, about what Simeon had done and informed her that she wanted to leave. (Ex. 2 at 59-60.) Plaintiff wanted to go see Amer, but Kim told her to stay put because she was wearing a telephone headset, and that she would go get Amer. Plaintiff waited 25 minutes and having not seen Amer, left her job. (Ex. 2 at 60-61.) This was her act of resignation. (Id.)

46. Plaintiff was unhappy with the situation because Simeon kept her job and continued to walk the floor doing her job. (Ex. 2 at 103-06.) Plaintiff felt ashamed and embarrassed and felt that people looked at her in the break room because of the complaint. (Id.)

47. When asked if she felt ACS was trying to make her life miserable, Plaintiff responded, "No, I wouldn't say that." (Ex. 2 at 107.) When asked if she thought ACS was trying to make her resign, Plaintiff responded, "No, I wouldn't say that." (Id.) Her opinion though was that ACS forced her to resign. (Id.)

48. When asked if she was claiming that anyone was intentionally trying to hurt her, Plaintiff responded, "No." When asked if she thought Simeon was trying to emotionally impact her, Plaintiff responded, "No." (Ex. 2 at 109.)

49. In support of her claim for intentional infliction of emotional distress, Plaintiff claims to be stressed, embarrassed, humiliated, and shamed, but she takes no medication and the stress does not impact her in any way whatsoever. When she sees people from EZ Pass it makes her remember what happened. (Ex. 2 at 113-14, 126.)

Respectfully submitted,

\_\_\_\_s/Samuel Zurik III_____
SAMUEL ZURIK III (LA #24716)
STEPHEN L. SCOTT (LA #25869)
The Kullman Firm, A Professional Corporation
1600 Energy Centre, 1100 Poydras St. (70163)
Post Office Box 60118
New Orleans, LA 70160
Telephone: (504) 524-4162
Facsimile: (504) 596-4114

DANIEL J. DORON
Kilpatrick, Lockhart, Nicholson & Graham, LLP
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-3400
Facsimile: (212) 536-3901

COUNSEL FOR DEFENDANT,
A.C.S. STATE & LOCAL SOLUTIONS, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of May, 2006, a copy of the foregoing Statement of Uncontested Material Facts, was filed electronically and a copy was mailed, by overnight mail and properly addressed to the following:

>Dennis Adjei-Brenyah
>12 Rensselaer Drive
>Spring Valley, NY  10977-1827

>_____s/Samuel Zurik III_____